UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARL F. LOEB, on behalf of himself and all
others similarly situated,

Plaintiff,

v.

JPMORGAN CHASE & CO., J.P. MORGAN
CLEARING CORP., J.P. MORGAN
SECURITIES INC., J.P. MORGAN FUTURES
INC., HSBC HOLDINGS PLC, HSBC
SECURITIES (USA) INC., and HSBC BANK
USA, NATIONAL ASSOCIATION,

Defendants.

**10 CIV 8288**

CLASS ACTION COMPLAINT



U.S. DISTRICT COURT
FILED
NOV 02 2010
S.D. OF N.Y.

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................................4

III.   PARTIES ...............................................................................................................................4

       A.     Plaintiff .......................................................................................................................4

       B.     Defendants ..................................................................................................................4

       C.     Unnamed Co-Conspirators...........................................................................................6

IV.    FACTUAL ALLEGATIONS ...............................................................................................6

       A.     Background ..................................................................................................................6

              1.     Glossary. ...........................................................................................................6

              2.     Overview of commodity futures markets and COMEX silver futures
                     and options contracts.......................................................................................7

              3.     Short option positions. ....................................................................................8

              4.     Prices for physical delivery and futures prices for the underlying
                     physical commodity are directly correlated. ................................................9

       B.     Through Their Enormously Concentrated Short Positions, Defendants Had
              The Power To And Did Manipulate COMEX Silver Futures And Option
              Contract Prices .........................................................................................................10

              1.     The "thin" COMEX silver futures and options contracts market is
                     susceptible to collusion. ...............................................................................10

              2.     JPMorgan's acquisition of Bear Stearns set the stage for Defendants'
                     collusion. .......................................................................................................11

       C.     An Independent Silver Trader Blows The Whistle On Defendants' Conspiracy
              To Manipulate The Price Of COMEX Silver Futures Contracts And Options .....12

       D.     There Have Been Other Instances When Defendants Orchestrated A "Mini-
              Crash" In Silver Prices Through Manipulative Futures Shorting..........................15

       E.     The Price Movements Cannot Be Explained By Normal Supply And
              Demand Factors .......................................................................................................17

       F.     The CFTC Investigation ...........................................................................................18

       G.     Other Market Factors Indicate A Conspiracy.........................................................19

              1.     Silver futures and options contracts are standardized products
                     with a high degree of interchangeability. ....................................................19

|      | 2. | Defendants had a motive to manipulate the price of COMEX silver futures and options contracts. | 20 |

|      | 3. | Defendants had the opportunity to conspire through their participation in trade associations. | 21 |

| V.   | FRAUDULENT CONCEALMENT | 22 |
| VI.  | CLASS ACTION ALLEGATIONS | 24 |
| COUNT ONE | | 28 |
| COUNT TWO | | 28 |
| COUNT THREE | | 29 |

Plaintiff Carl F. Loeb, on behalf of himself and all others similarly situated, brings this action against JPMorgan Chase & Co., J.P. Morgan Clearing Corp.; J.P. Morgan Securities Inc.; J.P. Morgan Futures Inc. (collectively, "JPMorgan"); HSBC Holdings PLC; HSBC Securities (USA) Inc., and HSBC Bank USA, National Association (collectively, "HSBC") (together with JPMorgan, "Defendants") and alleges as follows:

## I.   INTRODUCTION

1.      This action arises from Defendants' conspiracy to intentionally and unlawfully manipulate the price of Commodity Exchange, Inc. ("COMEX") silver futures and options contracts in violation of Section 22(a)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25(a)(1), and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

2.      The Defendants are various J.P. Morgan entities and HSBC Holdings. Together, they amassed heavily concentrated positions in COMEX silver futures contracts. For example, by August 5, 2008, Defendants were short a massive 33,805 contracts, or more than 169 million troy ounces of silver – the equivalent of an astounding 25% of annual world mine production of silver.

3.      In a coordinated and unlawful conspiracy, Defendants manipulated the price of silver by utilizing their heavily concentrated positions in COMEX silver futures contracts to "crash" the price of COMEX silver futures and options contracts on numerous occasions since March 1, 2008 to the present (referred to as the "relevant period").

4.      For example, in September 2007, the largest four commercial traders, of whom Defendants are the dominant members, were net short 197,500,000 ounces of silver. The price of silver opened the following week at $12.94/ounce. Over the next six months, this same group of the largest four commercial traders increased their net short position to an astonishing 310,500,000 ounces of silver – effectively selling silver futures contracts to any and all buyers, flooding the market with artificial and imaginary supply of a commodity that they had no capacity and intent to fulfill with physical delivery if called upon to do so.

5.     As Defendants intended, the inevitable collapse of price in the face of endless paper supply of silver occurred on March 17, 2008 when the COMEX futures price touched $21.14/ounce, and fell to $16.72 per ounce a mere four days later. By late October of 2008, the price of silver had been reduced by 60% from its high to $8.40 per ounce. During this period of price decline, the largest four traders, including Defendants, reduced their net short positions by over 116,500,000 ounces of silver, reaping hundreds-of-millions of dollars in profits by virtue of their ability to manipulate the price of the commodity.

6.     Another manipulated "crash" occurred in February 2010 and was predicted and described in "real time" by an independent metals trader in London named Andrew Maguire, who had contacted the Commodity Futures Trading Commission ("CFTC") with detailed allegations of the mechanics of Defendants' illegal conspiracy to manipulate the prices of COMEX silver futures and options contracts. In his communications with the CFTC, Maguire described how JPMorgan silver traders signaled market participants, including HSBC, in-advance of their manipulation, so that they, along with other traders, could reap enormous profits by artificially and unlawfully manipulating the price of COMEX silver futures and options contracts.

7.     In a February 3, 2010 email to the CFTC, Maguire advised that he had received a "signal" from Defendants indicating their intent to depress the prices of COMEX silver futures and options contracts two days later, at or around the time of the announcement of the Non-Farm Payroll Report. Maguire explained how the manipulation would unfold based on whether the jobs report would be positive or negative. Either way, Maguire advised that Defendants would manipulate their short positions in such a manner to drive the price of silver sharply downward. The scheme played out exactly as this whistleblower predicted, with the price of silver dropping dramatically between February 3 and February 5, 2010.

8.     In March 2010, Maguire publicly disclosed his cooperation with the CFTC and released his emails predicting the market suppression of COMEX silver futures and options contracts.

010212-11 404748 v1

2

9.      Since that time, Defendants have stopped adding to their short positions in COMEX silver futures contracts. As a result, the price of silver has increased $7.00 since the end of July. In other words, by not substantially increasing their already substantial short positions, Defendants have taken their foot off the neck of the market, and the market has responded accordingly.

10.     In September 2008, the Enforcement Division of the CFTC commenced an investigation into manipulation in the silver market. On October 26, 2010, CFTC Commissioner Bart Chilton announced that there have been "violations 'of the Commodity Exchange Act in the silver market." Specifically, Commissioner Chilton concluded, "[t]here have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted." Commissioner Chilton indicated that the CFTC investigation was continuing and added that he was "hopeful that-the agency will speak publicly about the investigation in the very near future."

11.     Defendants devised and executed their scheme to manipulate and suppress the prices of COMEX silver futures and options contracts to benefit their financial positions which were tied to a decrease or suppression in the futures price of silver. Put simply, by virtue of a massive aggregate short position in silver that dwarfs every other major commodity group, Defendants were in a position to financially benefit should the price of COMEX silver futures decrease or be suppressed during the relevant period. The sheer size and concentration of their position guaranteed that Defendants could ensure through their illegal manipulation and other anticompetitive activities that the price of COMEX silver futures and options contracts would decrease or be suppressed.

12.     Defendants' manipulative and anticompetitive trading activity directly caused and resulted in the intentional unlawful manipulation of the prices of COMEX silver futures and options contracts during the relevant period.

13.     Defendants' conspiracy to manipulate and suppress the prices of COMEX silver futures and options contracts violates Section 22 of the CEA, 7 U.S.C. § 25, and RICO, 18

U.S.C. § 1962(c). Plaintiff and members of the Class suffered damages by trading COMEX silver future and options contracts at artificial prices during the relevant period, as more fully alleged herein.

14.     Defendants reaped hundreds of millions of dollars, if not billions of dollars in profits from their unlawful and manipulation of the prices of COMEX silver futures and options contracts at the expense of Plaintiff and the Class.

## II.     JURISDICTION AND VENUE

15.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25, and 18 U.S.C. § 1962(c).

16.     This Court has jurisdiction under Section 22 of the CEA, 7 U.S.C. 25, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b), (c) and (d). Defendants resided, transacted business, were found, or had agents in the District and/or the claims arose at least in part in the District.

## III.     PARTIES

### A.     Plaintiff

18.     Plaintiff Carl F. Loeb ("Loeb") is a resident of the State of Washington. During the relevant period, Loeb transacted in COMEX silver futures and options contracts, and was injured in his property as a result of Defendants' unlawful conduct.

### B.     Defendants

19.     Defendant JPMorgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York. JPMorgan Chase & Co. is a leading global financial services firm and one of the largest banking institutions in the United States with $2.1 trillion in assets, $164.7 billion in stockholders' equity, and operations in more than 60 countries.

20.     Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear, Steams Securities Corp., is a Delaware corporation with its corporate offices in Brooklyn, New York. JPMC is a subsidiary of J.P. Morgan Securities Inc., which is a wholly owned subsidiary of JPMorgan Chase & Co. JPMC is a registered Futures Commission Merchant with the CFTC.

21.     Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York. JPMS is a wholly owned subsidiary of JPMorgan Chase & Co. JPMS, through JPMC, provides securities and futures clearing, customer financing, securities lending and related services.

22.     Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York. JPMFI is a U.S. futures commission merchant and wholly owned subsidiary of JPMorgan Chase & Co. JPMFI provides research, sales, execution and clearing services in futures and options across fixed income, equity, foreign exchange and commodity asset classes. JPMFI holds the U.S. accounts of JPMorgan Chase's global futures and options business customers.

23.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England. As of 2009, HSBC Holdings was the world's largest banking group and the world's sixth largest company according to Forbes Magazine.

24.     Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York. HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc. whose ultimate parent is HSBC Holdings plc. HSBC USA is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and is a registered Futures Commission Merchant with the CFTC.

25.     Defendant HSBC Bank USA, National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

## C.    Unnamed Co-Conspirators

26.    Various other entities and individuals not named as Defendants in this Complaint and whose identities are presently unknown to Plaintiff participated as co-conspirators in the acts complained of, and performed acts and made statements which aided and abetted and were in furtherance of the unlawful conduct.

## IV.    FACTUAL ALLEGATIONS

## A.    Background

### 1.    Glossary.

27.    "Futures" or "futures contracts" are standardized, transferable, exchange-traded contracts that require delivery of a commodity, bond, currency, or stock index, at a specified price, on a specified future date.

28.    An "option" is the right, but not the obligation, to buy (for a call option) or sell (for a put option) a specific amount of a given stock, commodity, currency, index, or debt, at a specified price during a specified period of time. The specified price is sometimes called the "strike price."

29.    "COMEX" is a division of the New York Mercantile Exchange ("NYMEX") and has been designed by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures and options contracts for silver. COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts. Silver future contracts and silver options contracts are traded on COMEX.

30.    Silver is a "commodity" and is the "commodity underlying" silver futures and options contracts traded on the COMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

31.    "Long" is the state of actually owning a security, contract, or commodity, sometimes referred to as a "long position."

010212-11 404748 v1

6

32.     "Short" is the state of having sold a stock or commodity without having owned or "covered" it, sometimes referred to as a "short position."

### 2.     Overview of commodity futures markets and COMEX silver futures and options contracts.

33.     Unlike securities markets, in the commodity futures markets more than 99% of the contracts do not result in delivery of the underlying commodity and may remain open for many-month periods with no physical delivery of the commodity. Further, and also unlike securities markets, at any given time one-half of the participants in the futures markets are "short," and one-half of the participants are the buyers of a contract or "long."

34.     COMEX provides standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 60 sequential months into the future depending upon the month in which the contract was executed.

35.     A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future. The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

36.     Trades of silver futures contracts on the COMEX have two "sides" – long and short. The "long" side represents the buyer of a contract who is obligated to pay for the silver and take delivery. The "short" side represents the seller of a contract who is obligated to receive payment for the silver and make delivery.

37.     If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery." In other words, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical silver. Longs must *take* delivery and shorts must *make* delivery of 5,000 troy ounces per contract over the course of the contract month. The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

38.     Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a silver futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of silver by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

### 3.     Short option positions.

39.     There are a number of ways to "go short," or bet that the price of silver will *decrease* in the future. As discussed above, one can sell a futures contract which confers upon the seller an obligation to *deliver* silver at a pre-specified date in the future at a pre-specified price.

40.     Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to *purchase* silver from the seller at a pre-specified "strike price" at some date in the future (also know as the expiry date). At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option, which means the seller will pay the difference between the prevailing price and the strike price and make a profit. Conversely, if the price of silver falls short of the strike price, the option expires "out of the money."

41.     In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices *fall*. In the case of selling a futures contract, the seller at time of contract expiration simply offsets his position by purchasing a futures contract and pockets the difference in prices. In the case of a call option, the seller benefits if the prevailing price is below the strike price because it collects the option premium and pays nothing to the purchaser.

42.     During the relevant period, Defendants had net short positions in silver options contracts, including but not limited to, the sale of call options.

### 4.   Prices for physical delivery and futures prices for the underlying physical commodity are directly correlated.

43.   The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date. Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated.

44.   For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month. The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

45.   For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month. Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected. Thus, the increase today in futures price (for delivery next month) can cause producers to decrease the available supply of the commodity and prompt buyers of physical silver to increase their demand. The decrease in supply coupled with the increase in demand causes today's spot prices for the commodity to increase. The same causal economic story (albeit in reverse) prevails if futures prices decline.

46.   Therefore, changes in futures prices for delivery months into the future have tangible effects on physical spot prices today. Put statistically, futures prices and physical spot prices are linked and correlated.

50.   The principal purpose of the regulated futures market is to provide a mechanism for the "price discovery" of a particular commodity, that is, the appropriate price a willing producer will accept from a willing buyer. To ensure that the real world of supply and demand determines the appropriate price for a commodity, and to avoid price distortions created by

speculative activity on the futures market, concentration in futures markets is controlled, and historically has been the primary focus of concern for regulatory agencies.

**B.     Through Their Enormously Concentrated Short Positions, Defendants Had The Power To And Did Manipulate COMEX Silver Futures And Option Contract Prices**

**1.     The "thin" COMEX silver futures and options contracts market is susceptible to collusion.**

47.     The silver futures market is a "thin" market. This means that the number of futures contracts traded in the silver market is small, *i.e.*, "thin," in comparison to markets involving other commodities. For instance, in August 2008, there were only 129,240 open interest silver futures contracts (that is, silver futures contracts that had not yet settled). In contrast, there were 25 million open interest NYMEX Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

48.     The relatively sparse number of silver futures contracts regularly traded on COMEX enabled large banks, such as Defendants, to manipulate the price of silver futures contracts by flooding the market with a disproportionate number of contracts.

49.     In addition, the market for COMEX silver futures and options contracts is highly concentrated with only a handful of very large banks controlling a dominant number of futures and options contracts.

50.     In August 2008, subsequent to JPMorgan's acquisition of Bear Stearns, defendants JPMorgan and HSBC controlled over 85% of the commercial net short position in COMEX silver futures contracts and 25% of all open interest short positions.

51.     In the first quarter 2009, HSBC NA held 40% of all precious metals derivatives (excluding gold) held by commercial banks.

52.     As of the first quarter 2009, Defendants owned more than 96 percent of all precious metal derivatives held by U.S. banks (excluding gold), with a combined notional value $7.9 billion.[1]

53.     Prices in the silver futures and options market respond much more to large orders, large trades, and large positions than do prices in other commodity markets.

## 2.     JPMorgan's acquisition of Bear Stearns set the stage for Defendants' collusion.

54.     In March 2008, JPMorgan purchased Bear Stearns. Bear Stearns had amassed a significant short position in COMEX silver futures.

55.     By August 5, 2008, Defendants were short a massive 33,805 contracts, or more than 169 million troy ounces of silver. Defendants took no corresponding long positions on COMEX. This short position was equal to an astounding 25% of annual world mine production of silver. Defendants controlled significantly more than 25% of open interest in such positions. This stands in stark contrast to foreign banks whose short positions in COMEX silver futures contracts have been consistently less than 5% of open interest in these positions.

56.     A review of the Office of Comptroller of the Currency's Quarterly Report on Bank Derivatives Activities for the first quarter of 2009, which provides information on the value of derivative contracts for the top five commercial banks and trust companies, reveals that, together, JPMorgan and HSBC controlled 96% of all precious metals derivative contracts besides gold (which include silver).

57.     Given JPMorgan's significant market power in an already thin, concentrated market, Morgan knew that it could undertake massive short positions with relatively little or no risk. This was particularly true since it knew that HSBC, and others, would, as a result of the conspiracy, follow its lead.

---

[1] The "notional value" is the value of a derivative's underlying asset as determined by the asset's spot price. In the case of an options or futures contract, the notional value is the number of units of the asset underlying the contract multiplied by the spot price of the asset.

## C.    An Independent Silver Trader Blows The Whistle On Defendants' Conspiracy To Manipulate The Price Of COMEX Silver Futures Contracts And Options

58.    In November 2009, independent metals trader turned whistleblower Andrew Maguire contacted the CFTC Enforcement Division and reported Defendants' illegal conspiracy to manipulate and suppress the prices of COMEX silver futures and options contracts. Maguire described the scheme in a series of emails to Eliud Ramirez, a senior investigator for the CFTC's Enforcement Division.

59.    Maguire described how JPMorgan silver traders signaled HSBC and other market participants *to flood COMEX with short positions, thereby manipulating and "crashing" the price of COMEX silver futures and options contracts*.

60.    These "signals" were sent on a monthly basis on or around the dates of certain key events, including: (a) the issuance by the United States Department of Labor of Non- Farm Payroll Reports, which are released during the first week of each month;[2] (b) during COMEX silver futures contract roll-over;[3] and (c) at the time of Options Expiry on the last four business days of each month.

61.    With respect to the last mechanism, the expiration date of an options contract – or the "Options Expiry" – is the day on which an options contract is no longer valid and, therefore, ceases to exist. Because Defendants held net short positions in silver options contracts, Defendants profited by driving down the price of COMEX silver futures contracts. Indeed, by depressing the price of COMEX silver futures contracts, Defendants assured themselves that the long options contracts opposite their positions would expire out of the money. Since the options expired worthless, traders who owned the positions opposite to Defendants did not exercise their options, and Defendants reaped a profit.

---

[2] The Non-farm Payroll Report is an influential statistic and economic indicator released monthly by the United States Department of Labor as part of a comprehensive report on the state of the labor market.

[3] Contract rollover occurs each month when a futures contract holder exchanges (rolls over) an expiring contract position for a contract position which expires at a later date.

62.     In addition to describing the monthly "signals," Maguire also described daily

signals used by Defendants – what Maguire referred to as the "daily silver fix." During certain

times of the day, and typically when trading volume on the COMEX is light or "thin,"

Defendants rapidly dumped large numbers of COMEX silver futures contracts at or around the

same suppressed price. It was understood among Defendants and their co-conspirators that the

price of these contracts would set the direction of silver futures contracts prices for that day. As

Maguire explained in a January 26, 2010 email to Ramirez:

> As an example, if you look at the trades just before the pit open
> today you will see around 1,500 contracts sell at once where the
> bids were tiny by comparison in the fives and tens. This has the
> immediate effect of gaining $2,500 per contract on the short
> positions against the long holders, who lose that in moments and
> likely were stopped out.

63.     In a February 3, 2010 email to Ramirez, Maguire informed the CFTC that he had

received a "signal" from Defendants indicating their intent to depress the prices of COMEX

silver futures and options contracts two days later, at or around the time of the announcement of

the Non-Farm Payroll Report. In the email, Maguire then went on to explain how the

manipulation would unfold. He detailed two opposing jobs report scenarios, both of which

would result in a wave of short selling given the already concentrated positions that Defendants

held:

> Scenario 1. The news is bad (employment is worse). This will
> have a bullish effect on gold and silver as the U.S. dollar weakens
> and the precious metals draw bids, spiking them higher. This will
> be sold into within a very short time (1-5 mins) with thousands of
> new short contracts being added, overcoming any new bids and
> spiking the precious metals down hard, targeting key support
> levels.
>
> Scenario 2. The news is good (employment is better than
> expected). This will result in a massive short position being
> instigated almost immediately with no move up. This will not
> initially be liquidation of long positions but will result in stops
> being triggered, again targeting key support levels.
>
> Both scenarios will spell an attempt by the two main short holders
> [JPMorgan and HSBC] to illegally drive the market down and reap
> very large profits. Locals such as myself will be "invited" on
> board, which will further add downward pressure.

64. Two days later, on February 5, 2010, Maguire emailed Ramirez "to confirm that the silver manipulation was a great success and played out EXACTLY to plan as predicted...." The price of silver fell dramatically on February 3, 2010 as a result of Defendants' manipulation – and just as Maguire had predicted.



65. Maguire added, "How would this be possible if the silver market was not in the full control of [JPMorgan and HSBC] ... I hope you took note of how and who added the short sales (I certainly have a copy) and I am certain you will find it is the same concentrated shorts [JPMorgan and HSBC] who have been in full control since [JPMorgan] took over the Bear Stearns position."

66. In March 2010, Maguire went public with his allegations and revealed his emails to the CFTC predicting certain market movements.

67. In response, Defendants largely stopped adding to their already concentrated short positions, as they had done in the past after successfully "crashing" the market price of silver. As a result, the price of silver has increased $7.00 since the end of July. In other words, by not

substantially increasing their already substantial short positions, Defendants have taken their foot off the neck of the market, and the market has responded accordingly.

## D. There Have Been Other Instances When Defendants Orchestrated A "Mini-Crash" In Silver Prices Through Manipulative Futures Shorting

68.     While Maguire revealed to the CFTC in "real time" one episode in which Defendants flooded COMEX with short positions, thereby manipulating and suppressing the price of COMEX silver futures and options contracts, there have been others.

69.     For example, based on the CFTC Commitment of Traders report for September 11, 2007, the largest four commercial traders, of whom Defendants are the dominant members, were net short 197,500,000 ounces of silver. The price of silver opened the following week at \$12.94/ounce. Over the next six months, this same group of the largest four commercial traders increased their net short position to an astonishing 310,500,000 ounces of silver – effectively selling silver futures contracts to any and all buyers, flooding the market with artificial and imaginary supply of a commodity that they had no capacity and intent to fulfill with physical delivery if called upon to do so.

70.     As Defendants intended, the inevitable collapse of price in the face of endless paper supply of silver occurred on March 17, 2008 when the COMEX futures price touched \$21.14/ounce, and fell to \$16.72 per ounce a mere four days later. By late October of 2008, the price of silver had been reduced by 60% from its high to \$8.40 per ounce. During this period of price decline, the largest 4 traders reduced their net short positions (by buying them back) by over 116,500,000 ounces of silver, reaping hundreds of millions in profits by virtue of their ability to manipulate the price of the commodity.

71.     These "mini-crashes" orchestrated by Defendants (and only possible because Defendants had the power to manipulate the market) are highlighted in the graph pictured below.



72.     The "Big 4" net short positions displayed in the foregoing graph are taken from CFTC Bank Participation Reports, which provide statistical data on the number of COMEX silver futures contracts and relative positions taken by U.S. and foreign banks. Until November 2009, the CFTC Bank Participation Reports provided the number of U.S. and foreign banks that traded in COMEX silver futures contracts for a given month. Pursuant to applicable commodities law, which prohibits the CFTC from disclosing the identity and positions of commodity traders to the public, the CFTC Bank Participation Reports do not reveal the names of the banks that trade in COMEX silver futures contracts. On information and belief, JPMorgan and HSBC controlled most if not nearly all of the "Big 4's" commercial net short positions in COMEX silver futures contracts and open interest short positions. In November 2009, the CFTC decided to stop publishing the number of commercial banks for markets, such as COMEX silver futures contracts, where fewer than five banks participate.

73. The foregoing provide examples of Defendants' additional manipulations and are not intended to provide an exhaustive account of each manipulation. Indeed, there were many more.

## E. The Price Movements Cannot Be Explained By Normal Supply And Demand Factors

74. Analysis of the supply and demand for silver demonstrates that the price "crashes" highlighted above had no basis in economics.

75. Silver is used in coins and medals, culinary utensils, jewelry, and a myriad of industrial applications. The latter category includes photography, electronics, paint, and medical uses such as burn creams and antibiotics.

76. In addition to fabrication demand, there is an "investment" demand for silver, as funds – and in particular large Exchange Traded Funds or "ETFs" – accumulate silver for speculative purposes. In fact, during the period described above from September 11, 2007 through October 27, 2008, the iShare electronically traded silver fund increased deposits by over 78,000,000 ounces, continuing a steady trend of growth in investment demand for silver regardless of price fluctuations.

77. On the supply side, silver is supplied by government sales of reserves, mine production, and the recycling of silver from scrap. Historically, sovereign governments maintained silver (and gold) reserves to back currencies. As governments have moved away from securing paper currency with precious metals, governments have sold off their inventories of silver. As these reserves have been depleted, the government supply of silver has dwindled to the point where government sales of silver represent approximately 1% of the total silver supply in 2009. These government sales have not been replaced by an equivalent output of silver from mining operations.

78. Total fabrication and investment demand for silver has exceeded the supply of silver for years. The underlying fundamentals of supply and demand would thus indicate a rapidly upward acceleration, if not explosion, in the price of silver.

79.     But this inevitable price increase in the face of diminishing supply has been significantly suppressed as a result of Defendants' scheme. More importantly, the effect of the price manipulation scheme has been to "whip-saw" the market, forcing small traders to be stopped out of their positions, or to be forced to close those positions as a result of margin calls that never would have been made absent Defendant's illegal actions. The huge short positions taken by Defendants, and their manipulations thereof, came to drive the price of silver, instead of ordinary and lawful market forces, to the detriment of the other traders investing in silver on the basis of its intrinsic value.

80.     Defendants are classed as "Commercial Traders" by the CFTC. As such, they are expected to be legitimate hedgers of the commodity they trade. For example, Archer Daniels Midland, as a large producer of soybeans, would be a legitimate hedger of that commodity, using the futures market to facilitate revenue predictability. If their trading involves selling futures contracts, they are in a position to deliver the soybeans. By contrast, Defendant's grossly oversized short position represents such a large percentage of total world stocks of silver that there is no possibility of their actually delivering contracts they have sold. In other words, the only purpose of these positions is speculation and manipulation, and with the concentration of positions they hold, Defendants can and have ensured that their manipulations are always profitable, to the detriment of other long side traders in the market.

## F.     The CFTC Investigation

81.     In September 2008, the Commodity Futures Trading Commission ("CFTC") commenced an investigation into manipulation in the silver market.

82.     In September 2009, CFTC Commissioner Bart Chilton announced that the investigation was continuing, which, up to that time, had consumed 2,318 staff hours, 32 individual interviews, a review of about 40,000 documents and analytical review by an outside expert.

83.    According to an October 27, 2010, article published in the *Wall Street Journal*, the CFTC's enforcement staff has circulated a packet of information to CFTC staff and commissioners, outlining some of its findings in the silver probe.

84.    The same article also reported that CFTC staff have interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

85.    The article also cites a CFTC weekly report for October 19, 2010, the most recent period, showing that less than four market players hold 24.3% of all net bearish bets in the silver market. Relying on silver traders and a person close to the investigation, the article confirms that Defendants JPMorgan and HSBC are among those market participants.

86.    On October 26, 2010, CFTC Commissioner Bart Chilton announced that there have been "violations of the Commodity Exchange Act in the silver market." Specifically, Commissioner Chilton concluded, "[t]here have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted." Commissioner Chilton indicated that the CFTC investigation was continuing and added that he was "hopeful that the agency will speak publicly about the investigation in the very near future."

## G.    Other Market Factors Indicate A Conspiracy

87.    Various factors make the market for COMEX silver futures and options contracts susceptible to a market manipulation conspiracy.

### 1.    Silver futures and options contracts are standardized products with a high degree of interchangeability.

88.    When products offered are viewed as interchangeable by market participants, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain unlawful manipulations and an unlawful anticompetitive agreement or conspiracy.

89.    Here, COMEX silver futures and options contracts are interchangeable. Indeed, the COMEX specifies the terms of each contract, including the trading units, price quotation,

trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

    **2.**    **Defendants had a motive to manipulate the price of COMEX silver futures and options contracts.**

    90.    Defendants specifically intended to manipulate the price of COMEX silver futures and options contracts during the relevant period. Upon information and belief, Defendants consistently took positions in their trading of COMEX silver futures and options contracts that would inure to their financial benefit. Defendants consistently profited from manipulating and artificially driving down COMEX silver futures prices because, throughout the relevant period, they maintained significant short positions in COMEX silver futures and options contracts.

    91.    Upon information and belief, a significant portion of Defendants' short positions in the COMEX silver futures contracts were acquired through naked short selling, that is, Defendants would contract to sell in the future silver which they did not own or had made no provisions to borrow. Such naked short selling, unconstrained by the actual amount of silver owned or available to the short seller, enabled Defendants to more effectively manipulate COMEX silver futures and options contracts during the relevant period as alleged herein.

    92.    It has been estimated by at least one commentator that Defendants' short positions are in excess of existing world inventories. Mark Epstein, a prominent silver trader, publicly testified before the CFTC and explained:

> The size of the open interest in COMEX silver is irresponsibly large, given the reality of world inventories and production. Additionally, there is a significant imbalance between the largest long positions and the largest short positions, with the shorts being heavily concentrated. In a physically delivered futures contract for a commodity of finite-supply, this also exposes the marketplace to an unnecessary risk of failure-to-deliver. Such an event could destroy the COMEX silver market.

    93.    Because Defendants maintained significant naked short positions in COMEX silver futures and options contracts, they were incentivized to roll-over their massive short positions into succeeding months and cause price "crashes" by flooding the market with even more short positions. If prices for silver increased, Defendants would be forced to cover their

short positions and suffer enormous losses or deliver physical silver in quantities well in excess of what was available in the market.

94.     Further, each of the Defendants would have taken enormous short positions only if it knew beforehand and was confident that the other Defendant would support it and take similar short positions in the market for COMEX silver futures and options contracts. Absent their collusion, signaling and prior knowledge, it would not be in each of the Defendant's independent economic self-interest to go out on a limb and take such enormous short positions.

### 3.     Defendants had the opportunity to conspire through their participation in trade associations.

95.     Participation in trade associations can foster and facilitate an unlawful anticompetitive conspiracy. Throughout the relevant period, Defendants participated in numerous trade association activities and events together, which provided many opportunities to conspire and share confidential information and trading strategy.

96.     For example, Defendants are members of the Futures Industry Association ("FIA"), the Futures and Options Association ("FOA") and the London Bullion Market Association ("LBMA").

97.     HSBC USA and JPMFI are regular members of the FIA, a United States-based industry advocacy and education organization whose regular members are all futures commission merchants. In addition, the FIA's board of directors includes the managing director and global co-head of JPFMI's futures and options and OTC clearing, and Robert T. Cox, the managing director and head of futures of HSBC USA. Richard Berliand, the chairman of JP Morgan Futures and Options and head of JP Morgan-Bear Stearns' prime brokerage business, serves as a special advisor to the board. As part of FIA' Defendants participate in the annual Futures & Options Expo, the FIA/OIC Investor Education Day, the International Derivatives Expo, and other events and meetings.

98.     HSBC Bank PLC and JPMS are members of the FOA, an industry association for firms and institutions carrying on business in futures, options and other derivatives or which use

010212-11 404748 v1

21

such products in their business. FOA's principal role is to represent the interests of its members in the public and regulatory domain and deliver a wide range of support services to the membership. Defendants participate in annual events and conferences such as International Derivatives Week. In addition, Richard Berliand of JPMFI serves as a special advisor to FOA's Board.

99. Both JP Morgan Chase and HSBC NA are also members of the LBMA, the London-based trade association that represents the wholesale gold and silver bullion market in London.

## V. FRAUDULENT CONCEALMENT

100. By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, inter alia, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for COMEX silver futures and options contracts.

101. Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for COMEX silver futures and options contracts by, among other things, engaging in secret "signals" or communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

102. Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

103. Plaintiff and members of the Class were lulled into believing that the prices at which they purchased and sold COMEX silver futures and options contracts were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

104. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until they became public in or around the time of Bart Chilton's October 26, 2010 public statement.

105. At all relevant times and in all relevant respects, Plaintiff and other members of the Class exercised reasonable diligence.

106. None of the facts or information available to Plaintiff and members of the Class prior to October 26, 2010, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

107. Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about October 26, 2010.

108. Because the alleged conspiracy to manipulate the price of COMEX silver futures and options contracts was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, did not know that the price of COMEX silver futures and options contracts had been artificially manipulated and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether the conspiracies existed until October 26, 2010.

109. As a result of Defendants' conduct and concealment of their conspiracy to manipulate COMEX silver futures and options contracts, Plaintiff and members of the Class were prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until October 26, 2010.

110. Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiffs and members of the Classes from suing them for the unlawful

activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## VI.   CLASS ACTION ALLEGATIONS

111.   Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and others similarly situated. The "Class" is defined as:

> All persons or entities that were long in silver futures on COMEX and were forced out of the position due to a price collapse at any time since at least March 1, 2008.

112.   Excluded from the Class are Defendants, the Officers and Directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

113.   The Class is so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded COMEX silver futures and options contracts during the relevant period.

114.   Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

115.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including securities, antitrust, and RICO class action and other complex litigation.

116.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants conspired with others to artificially depress and manipulate the price of COMEX silver futures and options contracts in violation of the Sherman Act;

(b)     Whether Defendants' conduct, which manipulated and suppressed the prices of COMEX silver futures and options contracts, violates the CEA;

(c)     Whether Defendants' conduct had a manipulative effect on the prices of COMEX silver futures and options contracts purchased or sold by Plaintiff and the Class during the relevant period;

(d)     Whether Defendants violated RICO; and

(d)     The appropriate measure of damages, under the CEA and RICO, sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

117.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. By contrast, a class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small (although substantial in the aggregate), the expense and burden of individual litigation make it impossible for members of the Classes to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

010212-11 404748 v1

25

## COUNT ONE

## VIOLATION OF COMMODITY EXCHANGE ACT, 7 U.S.C., § 1

119. Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

120. Plaintiff and members of the Class sold COMEX silver futures contracts and/or purchased or sold options contracts during the relevant period at prices that were made artificial by Defendants' unlawful activities, and were injured as a result of Defendants' manipulation of the prices of those contracts.

121. Defendants' activities constitute manipulation of the prices of COMEX silver futures and options contracts during the relevant period in violation of Section 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

122. Defendants are liable to Plaintiff and members of the Class for the damages they sustained as a result of their CEA violations.

## COUNT TWO

## AIDING AND ABETTING VIOLATIONS OF COMMODITY EXCHANGE ACT, 7 U.S.C. § 25

123. Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

124. Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of COMEX silver futures and options contract prices, and willfully intended to assist these manipulations to unlawfully cause the price of COMEX silver futures and options contracts to crash or to otherwise reach artificial levels during the relevant period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

125. Defendants are liable to Plaintiff and the Class for the damages they sustained as a result of the CEA violations.

010212-11 404748 v1

26

## COUNT THREE

### VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT

126.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

127.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendants on behalf of the Class.

128.    Plaintiff, the members of Class, and the Defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

129.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of an association-in-fact enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

#### The JPMorgan-HSBC Enterprise

130.    For purposes of this claim, the RICO "enterprise" is an association-in-fact consisting of (a) JPMorgan and (b) HSBC, including their directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "JPMorgan – HSBC Enterprise." The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of manipulating the COMEX silver futures market. JPMorgan and HSBC each has a common purpose of manipulating the COMEX silver futures market in order to "crash" prices and thereby reap massive profits on unwinding short positions.

131.    The Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between JPMorgan and HSBC. There is a common communication network by which JPMorgan and HSBC shared and continued to share information on a regular basis throughout the relevant period. Typically, this communication occurred by use of the wires and mails in which JPMorgan and HSBC discuss and agree and signal the timing of jointly flooding the COMEX market with short positions.

JPMorgan and HSBC functioned as a continuing unit for the purposes of implementing the scheme, and when issues arose during the scheme each agreed to take actions to hide the scheme and to continue its existence.

132.    At all relevant times, HSBC was aware of JPMorgan's manipulative conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Their joint activity included the following: (a) participating in "signals," meetings and/or conversations to unlawfully discuss the· price of COMEX silver futures and options contracts; (b) agreeing through these "signals," meetings or conversations to unlawfully work to crash the price of COMEX silver futures contracts, prevent such prices from increasing, or to otherwise collusively make artificial the prices of COMEX silver futures and options; (c) holding large positions in the COMEX silver futures and other silver markets; and (d) making large trades intended to manipulate the market.

133.    The impacts of the scheme are still in place, *i.e.*, JPMorgan and HSBC still hold highly concentrated short positions, although they have stopped substantially adding to their short positions in COMEX silver futures contracts. Bank Participation Reports reveal "Big 4" holdings of silver short positions – of which JPMorgan and HSBC control most – as follows: February 2010, 37,398; March 2010, 30,431; July 2010, 31,431; August 2010, 26,855; October 2010, 30,442. Defendants still have the ability to manipulate the price of silver.

134.    The foregoing evidences that JPMorgan and HSBC each was a willing participant in the Enterprise; had a common purpose and interest in the establishment and operations of the scheme; and their agreement to a structure wherein JPMorgan and HSBC agreed on how the operation of the Enterprise would be conducted. This structure was the basis in which the Enterprise operated.

### The Defendants' Use of the U.S. Mails and Interstate Wire Facilities

135.    The Enterprise engaged in and affected interstate commerce because it engaged in the manipulation of silver prices on a national exchange (COMEX).

136.     During the relevant period, the Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and funds by the U.S. mails and interstate wire facilities.

137.     The nature and pervasiveness of the scheme, which was orchestrated out of the trading operations of each Defendant, necessarily required those traders to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

138.     Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the scheme alleged herein depended upon secrecy. However, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme as follows.

139.     The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the scheme involved hundreds or thousands of communications throughout the relevant period including, *inter alia*:

(a)     Signaling via interstate wire facilities the timing that they would flood COMEX with short positions, thereby manipulating and "crashing" the price of COMEX silver futures and options contracts; and

(b)     Placing orders on COMEX via interstate wire facilities in order to carry out the scheme.

### Conduct of the RICO Enterprises' Affairs

140.     During the relevant period, the Defendants have exerted control over the Enterprise and, in violation of Section 1962(c) of RICO, the Defendants conducted or participated in the conduct of the affairs of the Enterprise, directly or indirectly, by accumulating

market power to influence the price of silver on COMEX by virtue of the concentrated positions
that they had amassed and using that power to flood COMEX with short positions, thereby
manipulating and "crashing" the price of COMEX silver futures and options contracts.

141.    The Enterprise had a hierarchical decision-making structure headed by JPMorgan.
JPMorgan was the leader in deciding when to send the signal indicating that Defendants should
flood COMEX with short positions, thereby manipulating and "crashing" the price of COMEX
silver futures and options contracts.

142.    In violation of Section 1962(c) of RICO, each Defendant conducted the affairs of
the Enterprise.

### The Defendants' Pattern of Racketeering Activity

143.    Each of the Defendants conducted and participated in the affairs of the Enterprise
through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C.
§ 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendants'
pattern of racketeering likely involved hundreds if not thousands of separate instances of use of
the U.S. mails or interstate wire facilities in furtherance of their scheme. Each of these
fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within
the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of
racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendants
intended to defraud plaintiffs, members of the Class and other intended victims.

144.    Defendants' pattern of racketeering activity included (a) participating in "signals,"
meetings and/or conversations to unlawfully discuss the price of COMEX silver futures and
options contracts; (b) agreeing through these "signals," meetings or conversations to unlawfully
work to crash the price of COMEX silver futures contracts, prevent such prices from increasing,
or to otherwise collusively make artificial the prices of COMEX silver futures and options; (c)
holding large positions in the COMEX silver futures and other silver markets with no ability to
actually deliver the supply; and (d) making large trades intended to manipulate the market.

145.    The Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and members of the Class. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff and members of the Class. Each of the Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

**Damages Caused by the Defendants' Scheme**

146.    The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiff and members of the Class to be injured in their business or property. Plaintiff and other members of the Class who traded COMEX silver futures and options contracts during the relevant period were deprived of normal, competitive trading patterns and instead were subjected to artificially determined prices that were suppressed as a result of Defendants' unlawful conduct.

147.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiff and members of the Class for three times the damages that Plaintiff and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's counsel as counsel for the Class;

B.      Determining that the unlawful conduct alleged herein is a violation of the CEA;

C.      Awarding Plaintiff and the Class damages, as provided under the CEA, together with prejudgment interest;

D.      Determining that the unlawful conduct alleged herein is a violation of RICO;

010212-11 404748 v1

31

E.      Permanently enjoining and restraining Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, from continuing and maintaining the manipulations and conspiracy alleged in the Complaint;

F.      Awarding Plaintiff and the Class damages, as provided under RICO and jointly and severally, in an amount to be trebled in accordance with RICO;

G.      Awarding Plaintiff and the Class their costs of the suit, including attorneys' fees, as provided by law; and

H.      Directing such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: November 2, 2010.

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP

By
Samuel H. Rudman
Robert M. Rothman
58 So. Service Road, Suite 200
Melville, New York 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

Steve W. Berman
Sean R. Matt
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Bonny E. Sweeney
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423